William PATTERSON, Appellant,

v.

UNITED STATES, Appellee.

Jesse WITHERSPOON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11525, 11560.

District of Columbia Court of Appeals.

Argued Dec. 13, 1977.

Decided March 28, 1978.

Francis D. Carter, Washington, D. C., for appellant in No. 11525.

William H. Dowdy, Washington, D. C., with whom Warren C. Nighswander and Silas J. Wasserstrom, Washington, D. C., were on brief, for appellant in No. 11560.

Cheryl M. Long, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry and Peter E. George, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KELLY, GALLAGHER, and FERREN, Associate Judges.

FERREN, Associate Judge:

Appellants claim that the trial court erred in failing to suppress their identifications by a robbery victim at pretrial lineups and at trial. They argue that a suggestive photographic display had preceded and tainted these identifications. Because we can perceive no possibility of the substantial risk of misidentification proscribed by the due process clause of the Fifth Amendment, we affirm.

I

Just after 11:00 p. m. on September 6, 1975, Raymond Holmes set out for a local bar on Fourteenth Street, N.W. As he approached the corner of Fourteenth and Buchanan Streets, Mr. Holmes spotted two men standing on the opposite side of the street. As he was waiting at the corner for a vehicle to pass, one of the men approached him, grabbed him from behind, and, pressing a hard object into his back, demanded his money. When Mr. Holmes turned and discovered that he was being threatened at "Coke-bottle-point," he started to scuffle with the assailant. At that point the second individual whom he had observed across the street approached, struck him on the head with a bottle, and removed his watch. After some further scuffling, during the course of which Mr. Holmes observed the facial features of the attackers, the robbers took flight amidst a shower of hard objects (stones, bottles, etc.) thrown by Mr. Holmes. The entire incident lasted approximately five minutes.

Mr. Holmes hailed a passing policewoman and reported the incident; she summoned another officer by radio. The police transported Mr. Holmes around the vicinity for a while, hoping that he might spot the attackers. After approximately one-half hour of unsuccessful searching, they returned him to his home.

Before long, Mr. Holmes set out once again for the bar. Sometime between 12:30 and 12:45 a. m. on September 7, as he neared the same corner at which he was robbed, he saw the individual who had first grabbed him coming down Buchanan Street. Mr. Holmes called the police, pointed out the assailant to Officer Belisle (who had responded to the call), and rode with the officer down the block to the robber's location. As he observed Officer Belisle arresting the first attacker (later identified as appellant Witherspoon), Mr. Holmes saw the other assailant (appellant Patterson) standing among the onlookers. He apprised Officer Thornes who was standing nearby, whereupon Officer Thornes arrested Mr. Patterson.

The grand jury indicted Messrs. Patterson and Witherspoon, each on one count of robbery (D.C.Code 1973, § 22–2901), on December 1, 1975. On the morning set for trial, April 1, 1976, the Assistant United States Attorney assigned to the case displayed "mug shot" photographs of the defendants to Mr. Holmes to be certain that he could identify them at trial. To the prosecutor's surprise, Mr. Holmes first stated that the individuals in the photographs

did not look like his assailants—that the men in the pictures looked older, more mature. Only after more viewing and reflection did Mr. Holmes decide that the photographs depicted the likenesses of the robbers.[1]

The prosecutor informed defense counsel and the court about these events. The court then entertained defense motions to suppress prospective in-court identifications because of the suggestiveness of the single-photo displays. After hearing the motions, the trial court decided to permit the in-court identifications. Although the judge did not specify the ground for this ruling, he apparently concluded that there were reliable bases for the identifications independent of the suggestion inherent in the photographic showing. Trial could not commence on schedule because the case had to be assigned to another Assistant United States Attorney—a result precipitated by the defense decision to call the original prosecutor as a witness to the photo displays. In view of the delay, the trial court ordered that a lineup be held for each defendant. (None had been conducted previously.) Mr. Holmes identified both Mr. Patterson and Mr. Witherspoon at these lineups.

At a hearing prior to the commencement of trial on August 17, 1976, defendants renewed their motions for suppression of the in-court identifications. They also requested suppression of the lineup identifications. Defendants argued that the taint from the suggestive single-photo displays in April had infected the lineups, and that the taint from both the photo displays and the lineups would inevitably infect the in-court identifications. The trial court ruled that the lineup and in-court identifications · would be permitted. Although the ground for the ruling again was not specified, the court apparently concluded that the first and second sightings on September 6 and 7, 1975, comprised a reliable, independent basis for the identifications.

---

1. The record reflects that during a portion of this time the prosecutor absented himself, leaving Mr. Holmes alone with a police officer who had been involved in arresting appellants. We

After two days of trial, the jury convicted both defendants. On October 27, 1976, the trial judge sentenced Mr. Witherspoon to a term of from ten months to six years. He sentenced Mr. Patterson to a term of from two to six years, suspending execution of all but five months and imposing a three-year probation upon completion of the five months.

## II.

Appellants are now before this court with their arguments that the unnecessarily suggestive photographs shown to Mr. Holmes on the morning of the initial trial date tainted the subsequent lineup and courtroom identifications, and that the admission of these identifications into evidence accordingly violated due process under the principles of *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and its progeny. Such a challenge normally triggers a two-stage inquiry:

(1) Was the identification procedure "unnecessarily suggestive and conducive to irreparable misidentification"? *Id.* at 302 [87 S.Ct. 1967];

(2) If so, given the "totality of the circumstances," was the resulting identification reliable nonetheless? *Manson v. Brathwaite* [432 U.S. 98], 97 S.Ct. 2243, 2249 [53 L.Ed.2d 140] (1977); *Neil v. Biggers,* 409 U.S. 188, 199 [93 S.Ct. 375, 34 L.Ed.2d 401] (1972). *See Simmons v. United States,* 390 U.S. 377, 384 [88 S.Ct. 967, 19 L.Ed.2d 1247] (1968).

In the present case, the trial judge implicitly found suggestiveness; he then apparently proceeded to the second stage of the inquiry and found an "independent source" for the lineup and in-court identifications; *i. e.,* a basis for identification that

---

have been shown no specific evidence of impropriety, and we decline to presume or even speculate that the officer influenced Mr. Holmes' eventual recollection.

makes it nonetheless reliable.[2] His suggestiveness determination unquestionably was correct. The prosecutor, in his office on the morning of the day originally set for trial, had handed mug shot photographs of the two defendants to Mr. Holmes and asked if they were the men who had robbed him.[3] Such single-photo displays are inherently suggestive. *Manson, supra; Simmons, supra.* They have been designated the "most suggestive" and therefore the "most objectionable method of pretrial identification." *United States v. Dailey,* 524 F.2d 911 (8th Cir. 1975).

 Ordinarily, once unnecessary suggestiveness is found, its conduciveness to "irreparable misidentification" is obvious. The court accordingly proceeds forthwith, as the trial judge did here, to the second stage of the inquiry: the assessment of whether the identification is nonetheless reliable, based on the various factors enumerated in *Manson, supra,* and *Neil, supra.* Cf. *United States v. Wade,* 388 U.S. 218, 241–42, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (acknowledges possible "independent source" for in-court identification despite Sixth Amendment violation of right to counsel at pretrial lineup).[4] The present case is of a rare breed, however, for although the single-photo displays were unnecessarily suggestive, they were not conducive to irreparable misidentification. Thus, as elaborated below, we do not leave

the first stage of the inquiry; reliability does not become an issue in the same sense that it typically does following a suggested identification.

In the more common case of a challenged identification, a suspect is apprehended based on a police lookout, after which a complaining witness is asked to identify the suspect at a highly suggestive showup or at an arguably skewed or otherwise suggestive photographic array or lineup. From the very first identification, therefore, suggestiveness is inherent in the process; there is a risk of initial misidentification. Here, however, the first identifications occurred when Mr. Holmes sighted the suspects (who had robbed him merely an hour and a half before) and pointed them out to the officers. He led the police to the appellants; the police did not bring them to Mr. Holmes. Thus, the initial identifications to the authorities unmistakably were based on observation without suggestion.

It may well be true that the lapse of time between robbery and trial dimmed Mr. Holmes' memory of the suspects and that the single-photo displays helped bring his memory back. Nevertheless, as recent Supreme Court cases have made clear, these suggestive showings could not have created a "very substantial likelihood of irreparable *misidentification.*" *Simmons, supra,* 390

---

**2.** Actually, the United States Supreme Court has used the "independent source" language in the context of Sixth Amendment right to counsel violations. *United States v. Wade,* 388 U.S. 218, 242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The Fifth (and Fourteenth) Amendment due process opinions, *Manson, supra; Neil, supra; Simmons, supra*; and *Stovall, supra,* have characterized the question as one of "reliability." While the semantic purity probably should be preserved, the factors which are relevant to the determinations—indeed the very determinations themselves—are essentially the same. (Mr. Justice Marshall pointed this out in his dissenting opinion in *Manson, supra,* 97 S.Ct. at 2257.) *See Clemons v. United States,* 133 U.S.App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), where the D.C. Circuit Court of Appeals uses the term "independent source" in discussing both Fifth and Sixth Amendment violations.

**3.** While it may be argued that the complainant's initial, essentially negative response to the exhibition of the photographs belies suggestiveness, the witness's eventual identifications of the photographs indicate that he was influenced by the nature of the display. Such suggestion carries a strong potential for influencing and tainting the subsequent identifications.

**4.** These factors, which comprise the "totality of the circumstances" referred to in *Manson, supra,* and *Neil, supra,* include: opportunity of the witness to view the defendant as the crime took place, the witness's degree of attention, discrepancies between the description and a defendant's actual appearance, other previous identifications of, or failures to identify, the same defendant, the witness's level of certainty, and time between the crime and the identification. *Manson, supra,* 97 S.Ct. at 2253; *Neil, supra,* 409 U.S. at 199–200, 93 S.Ct. 375; *cf. Wade, supra,* 388 U.S. at 239, 87 S.Ct. 1926.

U.S. at 384, 88 S.Ct. at 971 (emphasis added). *See Neil, supra,* 409 U.S. at 198, 93 S.Ct. 375. At worst, the "refresher" photos produced a misleadingly current, positive identification derived from a previously untainted one. Just as a procedure devoid of suggestion cannot yield the "primary evil" of misidentification, *id.,* a procedure that includes suggestive elements *subsequent* to an unequivocal, unsuggested identification does not pose an unconstitutional risk of misidentification—of trying and convicting the wrong person.

The D.C. Circuit Court of Appeals has so held in *United States v. Hines,* 147 U.S.App. D.C. 249, 262–63, 455 F.2d 1317, 1330–31, *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972), which concerned the display of refresher photographs of the defendant to the complaining witness before trial but *after* the witness had identified the defendant at a valid showup and lineup. The court stated:

> *Simmons* was . . . concerned with eliminating suggestivity in the situation where photographs were being used by the police or prosecution to narrow a field of suspects. Mr. Justice Harlan, the author of the *Simmons* opinion, constantly refers therein to the hazards of "*initial* identification by photograph," and his fear that such procedures might lead to "an irreparable mistaken identification." *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. 967 (emphasis supplied). *We do not believe that once an eyewitness has made a positive identification, counsel's attempt to review that identification through the use of photographs in a preparatory session falls within the bounds of that case. Such an identification is neither "initial" nor is it likely to lead to a misidentification, since the witness has already identified the sus-*

pect *in a constitutionally acceptable manner.* [Emphasis added.]

The Fourth Circuit appears to support this view. *See United States v. Mackey,* 474 F.2d 55 (4th Cir.), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2782, 37 L.Ed.2d 401 (1973).[5]

■ In summary, we conclude that when there has been an unequivocal, unsuggested, and otherwise constitutionally acceptable identification, subsequent identifications—even "refreshed" ones in open court, such as Mr. Holmes'—are not conducive to irreparable misidentification, in violation of due process. For admissibility, therefore, such subsequent identifications need not be justified by the comprehensive "reliability" (or "independent source") analysis required when an initial identification has been tainted. Under such circumstances it will be defense counsel's responsibility during cross-examination to expose weaknesses of the identifications which follow suggestive procedures employed by the government to refresh recollection.[6]

In the present case, the circumstances surrounding the refresher photograph, lineup, and in-court identifications were thoroughly examined at trial. Defense counsel relied heavily on the suggestiveness of the photo display, on Mr. Holmes' unexpected, initially negative responses, and on the various contradictions and confusion betrayed by his testimony describing the assailants. In the circumstances of this case, where positive on-sight identifications were made, the ambiguity and confusion which followed the photographic showing could only redound to the defendant's benefit. The credibility of Mr. Holmes' on-the-scene identifications could well have been damaged and his subsequent identifications devalued by his hesitation and inaccuracy at the photographic display. Appellants took

---

**5.** The identifications initiated by Mr. Holmes were probably less vulnerable to due process difficulties than the constitutionally acceptable showup and lineup that preceded the "refresher" photographs in *Hines, supra.*

**6.** Prior to *Stovall v. Denno, supra,* pretrial identifications had been a matter of weight and credibility to be explored on witness examina-

tion and argued to the jury. *Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. 375. When the due process concern is eliminated—*i. e.,* jeopardy to a fair trial because of a risk of misidentification—the issue again should become a matter for exploration at trial and argument to the jury. *Hines, supra* at 263, 455 F.2d at 1331. *See Manson, supra,* 97 S.Ct. at 2254.

full advantage of this development in their presentations before the jury.

On the facts of this case, therefore, we hold, after making the first-stage inquiry, that the unnecessarily suggestive single-photo displays were *not* conducive to irreparable misidentification, because there had been a prior unequivocal, unsuggested, and otherwise constitutionally acceptable identification. No further inquiry is required. We affirm appellants' convictions.

 In so holding, however, we caution that the invocation of the principles of this opinion will be justified only when the constitutionally acceptable identification which precedes the challenged suggestive procedures has been *unequivocal and unsuggested.* All other cases involving suggestiveness must be resolved according to traditional due process doctrine requiring proof of "reliability" under the "totality of the circumstances." *See* note 4, *supra* ; *United States v. Dailey, supra.*[7] We further suggest, in order to obviate potential due process difficulties and to preserve the defense right to adequate cross-examination, that in addition to other disclosures required by law, *see Clemons v. United States,* 133 U.S. App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), the prosecution, upon request, should reveal to the defendant—as it commendably did here—not only all pretrial identifications but also all pretrial "refreshment" procedures.[8]

*Affirmed.*

---

**7.** We encourage trial courts to conduct the usual two-step inquiry as a precaution in all cases which are ambiguous; *i. e.,* where there is some evidence that the initial identification may have been equivocal or suggested. Moreover, we do not intend to limit trial courts' discretion to exclude evidence in cases where the peril of misidentification *is* a possibility. We agree with the D.C. Circuit Court of Appeals that the Supreme Court

 has formulated a broad standard of review which focuses upon the distinctive facts of

each case in their totality, and which relies very heavily upon the special capacity and experience of judges, trial and appellate, to discriminate between real and fancied dangers of the miscarriage of justice. [*Clemons v. United States, supra* at 34, 408 F.2d at 1237.]

**8.** Of course, witness reactions of an exculpatory nature may be subject to disclosure as *Brady* material. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).