**UNITED STATES of America**

v.

**Thomas M. ROBINSON, Jr., Appellant.**

**No. 81–1560.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 28, 1983.

Decided Nov. 1, 1983.

Sebastian K.D. Graber, Alexandria, Va. (appointed by the Court), for appellant.

J. Herbie DiFonzo, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before TAMM and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

On June 10, 1969 a three-count indictment was returned against appellant, Thomas M. Robinson, charging him with first-degree burglary, petit larceny, and assault with a dangerous weapon. On November 4, 1969 Robinson pled guilty to second degree burglary. Robinson appeared for sentencing on February 17, 1970. At that time the District Court ordered that a study be prepared pursuant to 18 U.S.C. § 5010(e) of the Federal Youth Corrections Act [1] (hereinafter the "YCA" or "the Act") to determine whether Robinson would benefit from sentencing under the Act, and Robinson was committed to the custody of the Attorney General for study and appraisal.

On May 6, 1970 Robinson was back before the District Court, the § 5010(e) study having been completed. The court then sentenced appellant under the YCA pursuant to 18 U.S.C. § 5010(b) for a term not to exceed the statutory maximum of six years under the Attorney General's supervision. The court also dismissed the remaining counts against Robinson.

Robinson was released on parole from the Community Treatment Center on June 25, 1971. On August 5, 1971 his parole status was changed to "inactive" and he was no longer required to report to a parole officer. On February 16, 1976, six years after the original § 5010(e) study was ordered, Robinson was unconditionally discharged from his YCA sentence. The court is now asked to determine whether this release occurred prior to, or coincided with, the expiration of Robinson's maximum sentence. On this question turns appellant's right to the relief he seeks—the expungement of the burglary conviction from his record. If the date of the commitment for the § 5010(e) study is determined to be the date of Robinson's sentencing under the YCA, then he was unconditionally released upon the expiration of his maximum sentence. If, however, the date of his sentencing is determined to be the date of the § 5010(b) commitment, then Robinson's maximum sentence would not have expired until May 5, 1976, and his February, 1976 release would have occurred prior to the completion of that maximum sentence. We hold that his sentence began on February 17, 1970, that he is not entitled to expungement of his conviction, and thus that the ruling of the District Court is affirmed.

I.

The Federal Youth Corrections Act is Congress' response to the need for flexibility in the sentencing of young criminals. "It was intended to provide a flexible rehabilitation program for selected youthful offenders amenable to treatment . . . ." *White v. Reid,* 126 F.Supp. 867, 869 (D.D.C. 1954). The YCA offender is subject to "treatment", not simply punishment. Treatment "means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youthful offenders . . . ." 18 U.S.C. § 5006(f). The youthful offender, once sentenced under the Act, is guaranteed release from all supervision after a maximum of six years under the guidance of the

1. 18 U.S.C. § 5005 *et seq.* (1976).

Attorney General. 18 U.S.C. §§ 5010, 5017. The statute also provides a unique incentive to those sentenced under its provisions. 18 U.S.C. § 5021 states in part:

> (a) Upon the unconditional discharge by the Commission of a committed youth offender before the expiration of the maximum sentence imposed upon him, the conviction shall be set aside and the Commission shall issue to the youth offender a certificate to that effect.

Robinson's appeal to this court concerns his effort to gain this certificate.

This certificate ought to be the goal of every youth offender. It is in effect the return-ticket from a criminal conviction. Once given, it frees the young offender from the real disabilities of a criminal record and reduces the lingering stigma of a conviction:

> A youth offender committed under the provisions of the Youth Corrections Act upon his release unconditionally before the expiration of the maximum sentence imposed is entitled to have the conviction set aside "automatically" and not as a matter of discretion. This feature of the Youth Corrections Act gives it an operative effect, which presents a marked and important difference from a criminal conviction which can be relieved only by a presidential pardon and then only to a limited extent. Thus apart from and more important than the other differences urged upon us, a person sentenced under the Youth Corrections Act can, by virtue of his own good conduct, be spared the lifelong burden of a criminal record.... [A] Youth Corrections sentence ... can, by the choice and conduct of the individual, become a non-criminal episode so far as the public records are concerned.

*Tatum v. United States,* 310 F.2d 854, 855–56 (D.C.Cir.1962).

The opportunity to earn this certificate has been called by the Supreme Court a "particularly valuable benefit for the offender sentenced under the YCA ..." *Durst v. United States,* 434 U.S. 542, 548, 98 S.Ct. 849, 852, 55 L.Ed.2d 14 (1978). More recently the Court noted that "Congress'

purpose in adopting § 5021 was to promote the rehabilitation of youth offenders by providing a substantial incentive for positive behavior while serving a sentence under the YCA." *Tuten v. United States,* —— U.S. ——, ——, 103 S.Ct. 1412, 1415, 75 L.Ed.2d 359 (1983). In *Tuten,* the Supreme Court rejected arguments that the set-aside provision in § 5021 operated automatically upon *completion* of the offender's YCA sentence. It is thus settled that a youth offender will receive an automatic set-aside only if he is unconditionally released *prior to* the running of his maximum sentence. The Court wrote:

> Under the interpretation of § 5021(b) plainly suggested by the language of the statute, the conviction of a youth offender who has been placed on probation under § 5010(a) is not set aside where, as here, the court has *not* exercised its discretion to discharge him unconditionally "prior to the expiration of the maximum period of probation theretofore fixed by the court," which in this case was two years. This limitation is fully consistent with the rehabilitative purpose of the YCA as well as with Congress' intent to employ the set aside as an incentive for positive behavior by youths sentenced under the Act. The incentive might be significantly weaker if convictions were set aside regardless of whether the youth offender, by his conduct during the probationary period, had convinced the sentencing court to discharge him before the expiration of his probationary term. Although it would also have been reasonable for Congress to make the set-aside available to any youth offender who completes probation without incident, this result is certainly not compelled by the purposes of the Act.

*Id.* at ——, 103 S.Ct. at 1417.

While *Tuten* established that the automatic set-aside is available only to those youth offenders who are unconditionally discharged prior to the expiration of their maximum sentence, it did not inquire into the specifics for calculating the crucial dates of sentencing and discharge.

§ 5006(g) of the Act provides that " 'conviction' means the judgment on a verdict or finding of guilty, a plea of guilty, or a plea of nolo contendere." § 5017(c) states:

> A youth offender committed under section 5010(b) of this chapter shall be released conditionally under supervision on or before the expiration of four years from the date of his conviction and shall be discharged unconditionally on or on or before six years from the date of conviction.

This case requires the court to determine what is meant by the phrase "date of conviction" in § 5017(c). Mr. Robinson argues that "the date of conviction contemplated by § 5017(c) is the date of the judgment of conviction; that is, the date the court imposes sentence under the Act." Brief for Robinson at 4. He further asserts that "expiration of the 'maximum sentence imposed' under §§ 5010(b), 5017(c) and 5021(a) is six years from the date sentence is imposed under the Act, as reflected in the final Judgment and Commitment Order". *Id.* at 5. As the § 5010(b) sentence was ordered on May 6, 1970, and Robinson was unconditionally discharged on February 16, 1976, he urges that he was "unconditionally discharged *prior to* six years from the date of imposition of sentence", and thus that he "was entitled to an automatic set aside and should be granted a set aside *nunc pro tunc* as of February 16, 1976." *Id.*

The Government disagrees with this interpretation of the statute and argues that a "§ 5010(e) commitment constitutes an imposition of sentence ..." Brief for the United States at 5. It asserts that "there is no valid reason for excluding the time spent by a defendant in custody pursuant to a § 5010(e) commitment from the 'sentence' ultimately imposed." *Id.* Thus, the Government concludes, "the expiration of

appellant's maximum sentence occurred on February 16, 1976, the exact date he was unconditionally discharged." *Id.* at 6–7. The District Court agreed with the Government and denied Robinson's motion for expungement of his record. Order, *United States v. Robinson,* Crim. No. 866–69 (D.D.C. May 13, 1981). We affirm.

## II.

This case centers on the effect on a youth offender's YCA sentence of a court-ordered § 5010(e) study. The § 5010(e) study is a crucial component of Congress' scheme for dealing with young offenders. Age is not the single trigger which propels a young criminal into the YCA's framework. Rather, age plus an amenability to the treatment envisioned provides entrance into the YCA program. The § 5010(e) study is the means by which judges can reliably determine whether a young offender can benefit from a YCA sentence. This court has stated:

> As part of this elaborate [YCA] scheme Congress provided for the preparation of § 5010(e) reports, designed to supply "additional information as to whether [the] youth offender will derive benefit from treatment." The observation and study period furnishes an invaluable opportunity to discover why these youths committed crimes, whether and in what way society has failed them, and what might be done to foster productive, law abiding conduct in the future. The reports prepared are potentially useful presentencing aids to assist the judge in discharging his awesome responsibilities under the Act.

*United States v. Hopkins,* 531 F.2d 576, 581 (D.C.Cir.1976). We have also described the process typically associated with the conduct of a § 5010(e) study.[2] It is a thorough

**2.** We wrote in 1975:

> The classification center ordinarily used for young offenders convicted in the District of Columbia is the Lorton Youth Center. There the conduct of the § 5010(e) study is the responsibility of a Youth Center Classification Committee. The Committee is composed of a clinical psychologist and a Classi-

fication and Parole Officer and is charged by the Administrator of the Diagnostic Unit of the Youth Center. The Classification and Parole Officer is responsible for compiling a classification study reviewing the circumstances of the offense in question, the offender's social and family background and the quality of his relationship with the staff while

and comprehensive evaluation which draws upon all available data regarding the young offender, including his family and social background and his conduct while committed to the institution responsible for the study. It is the first step in the offender's rehabilitation. Because the commitment operates to confine the youth, it is also more than a simple "pre-sentencing aid." *United States v. Fort,* 409 F.2d 441, 443 (D.C.Cir.1969) (§ 5010(e) commitment constitutes a sentence for purposes of determining appealability of defendant's conviction). It is, in fact, a sentence. *United States v. Hinkle,* 492 F.2d 660 (D.C.Cir.1974) (§ 5010(e), commitment was a sentence so that appellant was convicted within the meaning of the impeachment statute). *See also United States v. Carter,* 225 F.Supp. 566 (D.D.C.1964). The court is now asked to decide whether this interim sentence is so interconnected with the permanent sentence rendered under the YCA that time spent under it ought also to be considered time spent under the final YCA sentence for the purpose of computing a young offender's maximum sentence and thus whether he has been unconditionally released prior to the expiration of that maximum sentence. We hold that it is so connected, and that it does so count.

We note first that the regulations of the United States Parole Commission provide that time spent "in custody in connection with the offense or acts for which sentence was imposed ..." is to be credited towards service of the sentence. 28 C.F.R. § 2.10(a) (1982). The regulation which deals specifically with YCA sentence computation states:

> (c) Service of the sentence of a committed youth offender ... commences to run from the date of conviction and is interrupted only when such prisoner or parolee: (1) Is on bail pending appeal; (2) is in escape status; (3) has absconded from parole supervision; or (4) comes within the provisions of paragraph (b) of this section

28 C.F.R. 2.10(c). The Commission's regulations make no effort to separate time spent committed for a § 5010(e) study from time generally spent under YCA sentence, even though a regulation exists that deals specifically with excludable time. The Government also argues that the District of Columbia Department of Corrections and the United States Bureau of Prisons compute youth offenders' sentences beginning with the date of a § 5010(e) study if there was one done.[3] Appellant's counsel stated at oral argument that although he thought the practices of these two agencies to be irrelevant, he had no reason to dispute the Government's assertion.

---

at the Center. He may conduct interviews not only with the offender but also with his family and community associates. The clinical psychologist compiles a personality profile of the offender, based on interviews with him and certain projective and intelligence tests. The three Classification Committee members prepare a joint evaluation and recommendation. This evaluation and recommendation, along with the individual reports of the Classification and Parole Officer and the clinical psychologist and a cover letter from the Superintendent or Assistant Director of the Youth Center are forwarded to the D.C. Board of Parole. Based on this material, the Board makes its own recommendation and submits the entire package of documents, the completed § 5010(e) study, to the court. *United States v. Dancy,* 510 F.2d 779, 783 (D.D. C.Cir.1975). While the record does not reveal the specifics of Robinson's § 5010(e) study, we have no reason to believe it was any less comprehensive than those conducted in the District in 1975.

3. The Government's brief states:

> We are informed by Barbara Howell, Miscellaneous Documents Examiner, District of Columbia Department of Corrections, and by Donald Anderson, Chief, Administrative Systems, United States Bureau of Prisons, that the sentence computation practice of both institutions is to deem the date of the § 5010(e) commitment as the date of conviction for purposes of determining the unconditional discharge date upon termination of the maximum term imposed. Both institutions give the youth offender credit for all time spent in custody in connection with the offense for which sentence was imposed, including any time spent in custody prior to the § 5010(e) commitment. *See* 18 U.S.C. § 3568.

Brief for the United States at 7, n. 5.

Because of the practices of these agencies the time spent under a § 5010(e) commitment has been routinely figured into sentence computations for youth offenders. Were the court to hold for appellant and decree that YCA sentences should run from the date of final sentencing after receipt of the study, two effects would follow. First, the ruling would result in the windfall of automatic expungement not only of Robinson's record, but also of the records of many YCA offenders who had been released on a date calculated under the current sentence computation procedures. Any offenders released on a date computed by reference to the time of their § 5010(e) commitments would be entitled to demand and gain automatic expungement of their convictions. Second, such a ruling would result in the imposition of additional commitment time for all offenders currently serving YCA sentences who had been studied under § 5010(e)'s provisions. These offenders would henceforth be denied credit toward the completion of their sentences for time spent during a § 5010(e) commitment. Neither logic nor precedent requires these unfortunate results.

We feel, as did the Fifth Circuit when it was confronted with a similar question, that the critical consideration at issue here is whether appellant was in " 'constructive custody' " while the § 5010(e)- study was underway. *Davis v. Markley,* 589 F.2d 784, 785 (4th Cir.1979). In *Davis* the court considered the denial of a writ of habeas corpus to a prisoner who argued that her sentence had been incorrectly computed. She argued that various time periods, amounting to 293 days, ought to be credited towards time spent serving her YCA sentence. A portion of those 293 days was time spent during a stay of an order committing her to the custody of the Attorney General for observation and report:

On August 19, 1975, petitioner's probation was revoked and the court ordered her committed to the custody of the Attorney General for observation and report, but suspended operation of the order until August 27, 1975. This 7 days is the first time period at issue. On No-

vember 5, 1975, petitioner was committed to the custody of the Attorney General for treatment and supervision . . .

*Id.* The court did not directly pass on the question of credit for time spent committed for study. But it did explicitly hold that the time spent under the stay of the order committing her for study was to be credited towards her YCA sentence:

[O]ur inquiry is whether during the [time periods] during which petitioner was on stay of execution of sentence she was in "constructive custody," *Suggs v. Daggett,* 522 F.2d [396] at 397 [10th Cir.1975]; if so, the Act's concern for correctional rehabilitation is met and the time must be considered operative. We find that petitioner's time on stay was tantamount to time on probation and was thus operative time within 18 U.S.C. § 5017(c). The stay orders required petitioner to regularly report her employment status to the court, and allowed the sentencing judge the flexibility to attempt to allow petitioner to rehabilitate herself through employment rather than incarceration. She remained at all times within the supervisory ambit of the correctional process.

*Id.* at 785–786. If a stay of a commitment for a § 5010(e) study is part of the "supervisory ambit", then the study itself is certainly part of the same penumbra. Time spent while under such a study should be, and was in Robinson's case, credited towards total YCA sentence time.

It should also be noted that the time available for study under § 5010(e) is openended. Once a youthful offender is committed for study, the United States Parole Commission must report its findings to the court within 60 days or within "such additional period as the court may grant . . ." 18 U.S.C. § 5010(e). It would cut against the statute's stated maximum sentence of six years to ignore these two months, and it would be inequitable in the extreme to ignore the lengthier periods when they arise. If a youth offender's § 5010(e) study required, for example, six months, it would under Robinson's theory have no bearing on the six year maximum sentence. Yet for that entire period the offender would presumably be undergoing the same rehabilita-

tive regime as would follow final sentencing under the YCA. There is simply no reason to divorce this § 5010(e) study from all that follows its completion.

This court has commented at length on the goals of the YCA. *See Doe v. Webster,* 606 F.2d 1226 (D.C.Cir.1979). We have rejected constructions of the YCA based upon "artificial premise[s]", *id.* at 1241, and Robinson's argument that substantive and functional differences separate the § 5010(e) commitment from the § 5010(b) commitment strikes us as artificial. Reply Brief for Robinson at 3. Robinson argues that "maximum available time" must be given to the Attorney General to ensure that young offenders receive the attention necessary to give rehabilitation a chance to succeed. *Id.* at 6. But Congress set an outside limit on the time available to reach that goal. We must emphasize the simple fact that time spent under the supervision of the Attorney General is part of that "maximum available time", whether it is time officially denominated as § 5010(e) time or § 5010(b) time. Accordingly, we hold that Robinson was not unconditionally released prior to the expiration of his maximum sentence, and therefore affirm the ruling of the District Court.

*It is so ordered.*