Reginald J. STEWART, Appellant,

v.

UNITED STATES, Appellee.

No. 84–510.

District of Columbia Court of Appeals.

Argued Jan. 9, 1985.

Decided March 29, 1985.

---

J. Philip Kessel, Washington, D.C., appointed by the court, for appellant.

R. Jeffrey Behm, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before PRYOR, Chief Judge, and BELSON and TERRY, Associate Judges.

PRYOR, Chief Judge:

Following a jury trial, appellant, Reginald J. Stewart, was convicted of two counts of first-degree burglary, D.C.Code § 22–1801(a) (1981), one count of robbery, *id.* § 22–2901, and one count of destruction of property, *id.* § 22–403. The government's case against Stewart rested on identifications by the victim, and her neighbor, Ms. Eloise Wilcox. Appellant alleges that the trial court (1) erred in failing to suppress pretrial identifications of appellant by the victim, made from a photographic display and at a line-up; (2) erred in permitting the government to impeach its own witness with a prior inconsistent statement, and in failing *sua sponte* to give a cautionary instruction concerning the impeach-ment; (3) incorrectly ruled that appellant's prior commitment for a Youth Corrections Act study under 18 U.S.C. § 5010(e) (1980) (§ 5010(e) study) could be used for impeachment purposes if appellant testified; and (4) committed error in sentencing. Finding no grounds for reversal, we affirm the convictions but remand the case to the trial court for resentencing.

I

At trial, the complainant testified that on the afternoon of June 2, 1983, a young man, whom she later identified as Stewart, approached her in the hallway of her apartment building in Northwest, Washington and asked her where a Mr. Thompson lived. She responded that she did not know a Mr. Thompson and directed appellant to the resident manager who was standing nearby.

The next evening, June 3, at about 7:00 p.m., the victim was alone in her apartment when she heard a knock at the door. She looked through the peephole and asked who was there. A male individual replied that he was seeking a "recommendation." The victim testified that from the individual's face and voice she recognized him as the young man with whom she had spoken in the hallway the previous afternoon. The victim opened the door a little and responded that she could not let him in because she did not know him. At that point, the entry was forced by appellant, and a second man, whom the victim had never seen before. The second man immediately struck the victim in the eye and knocked her to the floor. Appellant demanded money and the second man began choking, beating, and pushing her. The victim initially refused to show the men where she kept her money but stopped resisting after the second man ripped her clothes off and persisted in beating her. Appellant continued to search and ransack the apartment. Both men dragged the victim into her bedroom where the second man forced her to lie on the bed face down, gagged her, and bound her hands and feet. The second man threatened to

burn the victim in her bed and went to search for matches. While he was out of the room, the victim was able to free herself and run from the apartment to the first floor where she gained entrance to the apartment of neighbors. The neighbors called the police.

The victim was taken to the hospital where she remained for approximately twelve days. While she was in the hospital, Detective John Walton of the Metropolitan Police Department showed her an array of sixteen pairs of photographs. The victim identified appellant as one of the two men who had broken into her apartment and had assaulted her on the evening of June 3, 1983, and as the young man with whom she had spoken the day before the attack. Approximately one month after she was released from the hospital the victim identified appellant in a police line-up. She also identified appellant in court during trial.[1]

Appellant was also identified from a photographic array by Ms. Eloise Wilcox, another resident of the complainant's apartment building. Ms. Wilcox testified that she knew appellant by the name "Lucky," and that she had seen "Lucky" in the apartment building on the afternoon of June 2, 1983.

After a two day trial, the jury returned guilty verdicts on all counts. Appellant was sentenced to concurrent terms of imprisonment of seven to twenty-one years on each of the first-degree burglary convictions, five to fifteen years on the robbery conviction, and of one year for destruction of property. This appeal followed.

## II

At the pretrial suppression hearing, appellant claimed that the procedures underlying the photographic array identification were unduly suggestive. Appellant argued that, out of the sixteen pairs of photographs shown to the complainant, fifteen pairs showed a profile view of the individu-

al first, followed by a frontal view. Only appellant's photographs showed a frontal view first followed by a profile view.

Appellant claimed that the line-up identification was also impermissibly suggestive because appellant was noticeably younger than the other six individuals standing in the line. Moreover, appellant was dressed in a light colored sweatsuit, similar to the clothing worn by the man the complainant encountered in the hallway on the afternoon of June 2. Finally, appellant argued that both identifications were unreliable because the complainant's vision was blurred when she was punched in the eye, and because the lighting in the hallway and her apartment at the time in question was poor.

Based on the evidence adduced at the hearing and after reviewing the photographic array and a video tape of the line-up, the trial court concluded that there was nothing suggestive about the procedures utilized in either identification. The court found that the out of court identifications were "about as reliable as these things can be."

In *Patterson v. United States,* 384 A.2d 663 (D.C.1978), we stated that a challenge to identification procedures under the principles set down by the Supreme Court in *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1969, 1972, 18 L.Ed.2d 1199 (1967), can involve a two-part inquiry:

> (1) Was the identification procedure "unnecessarily suggestive and conducive to irreparable misidentification"?;
> (2) If so, given the "totality of the circumstances," was the resulting identification reliable nonetheless?

*Patterson v. United States, supra,* 384 A.2d at 665 (citations omitted); *see also Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■■■ In the instant case, the trial court made an initial finding that the procedures used by the police in both identification

---

**1.** Appellant does not challenge the in-court iden-    tification on appeal.

sessions were not suggestive. We are bound by the trial court's findings if they are supported by the evidence and in accordance with law. *United States v. Walton,* 411 A.2d 333, 339 (D.C.1979). After reviewing the record, including the photographs of the line-up and the photographs used in the array, we find considerable support for the trial court's finding of no suggestivity. With respect to both the photographic array and line-up, appellant appeared with other black males of similar physical characteristics and similar age. At no time did the police direct the victim's attention to appellant. In fact, the complainant testified at the suppression hearing that while viewing the photographic array she never noticed that appellant's photographs were in a different order from the rest. *See Harley v. United States,* 373 A.2d 898, 900 (D.C.1977) (photographic array not suggestive even though defendant was shown wearing clothing similar to that worn by alleged assailant); *United States v. Sherry,* 318 A.2d 903, 904–05 (D.C.1974) (photographic array not suggestive where defendant's photograph depicted only full face view while other photographs in array depicted both full face view and profile).

Following its conclusion that the identification procedures were not unduly suggestive, the trial court made an additional finding, *see Johnson v. United States,* 470 A.2d 756, 759 n. 1 (D.C.1983); *Patterson v. United States, supra,* 384 A.2d at 668 n. 7, that under the totality of the circumstances the complainant's identifications of appellant were reliable.[2]

■ In assessing whether an identification is reliable, the trial court must consider several factors including:

(1) the opportunity of the witness to view the criminal during the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.

*Taylor v. United States,* 451 A.2d 859, 863 (D.C.1982) (citing *Neil v. Biggers, supra,* 409 U.S. at 200–01, 93 S.Ct. at 382–83); *Manson v. Brathwaite, supra,* 432 U.S. at 114–15, 97 S.Ct. at 2253; *see also Patterson v. United States, supra,* 384 A.2d at 666 n. 4. Application of these factors to this case supports the trial court's ruling that the identifications were reliable.

■ The victim had considerable opportunity to observe appellant on two successive days: on June 2, 1983, when appellant approached her in the hallway; and on June 3, 1983, when he broke into her apartment.[3] She was also able to recognize appellant by his voice when he came to her door on the evening of June 3, because she had had a brief conversation with him the previous afternoon, and had overheard appellant's conversation with the resident manager as well.

Moreover, both of the victim's identifications took place within a short period following the incident. The victim was shown the photo array by Detective Walton two days after she was attacked, and she attended the police line-up within approximately six weeks of the incident. Detective Roger L. Simpson of the Metropolitan Police Department testified at the suppression hearing that the victim was very sure of her identifications.

In sum, we find no error in the trial court's conclusion that the identification procedures were not suggestive and that, in any event, both identifications had an independent basis of reliability.

---

2. Although we mention both stages of the trial court's findings, we note that "reliability [is] not ... an issue in the same sense that it typically [is] following a suggested (sic) identification." *Patterson v. United States, supra,* 384 A.2d at 666.

3. There was evidence at the suppression hearing that the hallways of the apartment building were lit with 60 watt bulbs, and that all the lights in the victim's apartment were lit during the robbery.

## III

Appellant also contends that the trial court committed reversible error in allowing the government to impeach Ms. Wilcox, a government witness, with a prior inconsistent statement. Moreover, appellant argues that once the prior inconsistent statement was introduced, the trial court committed plain error by failing *sua sponte* to give a cautionary instruction to the jury to the effect that the statement was not admissible for substantive purposes.

Ms. Wilcox testified on direct examination that on June 2, 1983, she saw a man whom she knew as "Lucky" enter the apartment building in which she and the complainant resided. On cross-examination, in response to defense counsel's question, Ms. Wilcox testified that the person known to her as "Lucky" had "a lot of freckles on his face." [4] On redirect examination, the following exchange took place:

Q. Now, do you know more than one person by the name of Lucky?

A. No, I only know one.

Q. You only know one?

A. That's the only one.

As a result of Ms. Wilcox's testimony, the prosecutor immediately requested a bench conference where he claimed surprise and sought leave to impeach the witness. According to the prosecutor, Ms. Wilcox had told him that morning in his office that she knew two people named Lucky, but that she had picked the photograph of the Lucky she had seen in her apartment building on June 2, 1983.

Over defense counsel's objection, the trial court granted the government's request to impeach Ms. Wilcox with her earlier inconsistent statement.

Thereafter, on redirect examination, Ms. Wilcox testified as follows:

Q. Do you remember talking to me this morning before you came in here to testify?

A. Yes.

Q. And at that time didn't you tell me you knew two people by the name of Lucky?

A. Yes, I knew two people by the name of Lucky.

Q. That's right. You knew—and you told me that, isn't that right?

A. Yes.

Q. Did one of those people have freckles?

A. Yes.

Q. And is the one you saw at the building, did he have freckles?

A. No, not then.

A party's right to impeach its own witness is governed by D.C.Code § 14–102 (1981), which provides:

When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause.

■ The statute vests broad discretion in the trial court; on appeal, this court may only disturb the trial court's finding of surprise if the ruling is without any rational basis. *Davis v. United States,* 370 A.2d 1337, 1339 (D.C.), *cert. denied,* 434 U.S. 853, 98 S.Ct. 168, 54 L.Ed.2d 123 (1977); *Parker v. United States,* 363 A.2d 975, 977 (D.C.1976) (quoting *Wheeler v. United States,* 93 U.S.App.D.C. 159, 211 F.2d 19 (1953), *cert. denied,* 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954)).

■ Shortly before she testified, Ms. Wilcox told the prosecutor that she knew two people named Lucky. Thus, when she testified at trial that she knew only one person named Lucky, whose description, *i.e.,* freckled, did not match appellant, the prosecutor in good faith claimed surprise. Upon reviewing the record before us, we

---

4. Appellant does not have freckles.

cannot say that there was no rational basis for the trial court's finding of surprise.[5]

▪▪▪ Appellant also argues that once the government was allowed to impeach Ms. Wilcox, the trial court erred in failing to give the jury a cautionary instruction concerning the limited purpose for which such a statement may be considered. Since no request for such an instruction was made at trial, we may only reverse upon a finding of plain error. Under the plain error standard, the assigned error must be so clearly prejudicial to the appellant's substantial rights as to jeopardize the very fairness and integrity of the trial. *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976).

▪▪▪ The general rule in this jurisdiction is that prior inconsistent statements of a witness are admissible for purposes of impeachment only and are not admissible as proof of the matters contained therein. *Turner v. United States,* 443 A.2d 542, 549 (D.C.1982) (and cases cited therein). In *Lucas v. United States,* 436 A.2d 1282 (D.C.1981), we held, however, that the failure to give an immediate limiting instruction, where a prior inconsistent statement has been introduced, does not always constitute plain error. *Id.* at 1284. Instead, the court must "evaluate the degree of error on a case by case basis." *Id.* at 1285; *see also Beale v. United States,* 465 A.2d 796, 803 (D.C.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). Thus, we must determine whether on this record the failure to give a cautionary instruction created a substantial likelihood of prejudice to the defendant.

▪▪▪ Ms. Wilcox's statement was, at most, cumulative evidence of appellant's presence at her apartment house on June 2. The victim's testimony concerning the events of June 3, and her identifications, on three separate occasions, of appellant as one of the assailants constituted the key evidence against appellant and is sufficient to support a conviction even if Ms. Wilcox's statement is ignored. *See Turner v. United States, supra,* 443 A.2d at 550.

Thus, even if the trial court erred in failing, *sua sponte,* to give the proper limiting instruction, no substantial prejudice has been shown by appellant. Accordingly, we conclude that the trial court did not commit plain error.

Indeed, if the witness' statements are viewed, as the government argues they should be, as an adoption of her prior statement to the prosecutor, then her testimony would constitute substantive evidence. *Watts v. United States, supra,* 362 A.2d at 711 n. 11 (quoting *United States v. Borelli,* 336 F.2d 376, 391 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)); *Turner v. United States, supra,* 443 A.2d at 549 n. 9. Under this reading, the trial court's failure to give a limiting instruction would not constitute any error.

### IV

During the course of trial, and over defense objections, the trial court, relying on *United States v. Hinkle,* 160 U.S.App.D.C. 394, 492 F.2d 660 (1974), ruled that evidence that appellant had been committed, in an unrelated case, for a § 5010(e) study, would be admissible for purposes of impeachment. Appellant claims that this ruling was erroneous because commitment for purposes of a § 5010(e) study does not constitute a final sentence and in this jurisdiction a conviction does not exist until sentence is finally imposed. *See* D.C.Code § 14–305 (1981); *Thomas v. United States,* 74 App.D.C. 167, 169, 121 F.2d 905, 907 (1941).

In *Hinkle,* the court reiterated its previous holding that, "commitment 'constituted an imposition of sentence' where 'the litigation is complete as to the fundamental matter at issue—the right to convict the ac-

---

5. We reject as frivolous appellant's contention that on the basis of the government's impeachment of Ms. Wilcox, her photo identification of appellant should have been suppressed as unreliable.

cused of the crime charged.'" *United States v. Hinkle, supra,* 160 U.S.App.D.C. at 395, 492 F.2d at 661 (quoting *United States v. Fort,* 133 U.S.App.D.C. 155, 158, 409 F.2d 441, 444 (1969)). Applying this principle, the court found that commitment of an individual for a § 5010(e) study constitutes a conviction for impeachment purposes.

 While we are not bound by the holding in *Hinkle,* we recognize that decisions of the Circuit Court are "entitled to great respect." *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

We agree with the Circuit Court of Appeals that commitment for a § 5010(e) study "does not fall neatly into the stages ordinarily found in a criminal case." *United States v. Hinkle, supra,* 160 U.S.App. D.C. at 396, 492 F.2d at 662. For example, a § 5010(e) commitment operates as an interim confinement and has been deemed so interconnected with the final Youth Corrections Act sentence, that the time served during the interim confinement counts as time spent under the final sentence for purposes of computing an offender's maximum sentence. *United States v. Robinson,* 232 U.S.App.D.C. 28, 32, 720 F.2d 203, 207 (1983); *see also United States v. Fort, supra,* 133 U.S.App.D.C. at 158–59, 409 F.2d at 444–45 (§ 5010(e) commitment is sentence for purposes of determining finality for appeal).

 We conclude that for the narrow evidentiary purpose of impeachment, the focus of which is the credibility of the defendant, there is no substantial reason for treating this interim type of commitment differently from the final commitment. Thus, we hold that upon an individual's commitment for a § 5010(e) study, the underlying conviction is admissible for the limited purpose of impeaching the credibility of that individual. *See* D.C.Code § 14–305 (1981).

**6.** Appellant was convicted of first-degree burglary with intent to steal and first-degree burglary

## V

 Finally, appellant contends that the trial court erred in not vacating one of his two convictions for first-degree burglary,[6] since both convictions are predicated on a single transaction.

We agree that on the facts of this case one of the two burglary convictions must be vacated. *See Thorne v. United States,* 471 A.2d 247, 248 (D.C.1983) (burglary convictions merge where neither required proof of an additional fact and the societal interest served by D.C.Code § 22–1801(a) was offended only once in the course of appellant's crime).

Accordingly, appellant's convictions are affirmed, and the case is remanded to the trial court with the instruction that one of the burglary convictions should be vacated and appellant should be sentenced on the other.

*So ordered.*